UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

**JENNIFER LEE HULIT**,                               Case No. 3:16-cv-00324-KI

                    Plaintiff,                        OPINION AND ORDER

        v.

**NANCY A. BERRYHILL**, **Acting
Commissioner of Social Security**,

                    Defendant.

        Lisa R.J. Porter
        JP Law PC
        5200 SW Meadows Rd., Ste. 150
        Lake Oswego, OR 97035

                Attorney for Plaintiff

        Billy J. Williams
        United States Attorney
        District of Oregon
        Janice E. Hebert
        Assistant United States Attorney
        1000 SW Third Ave., Ste. 600

Page 1 - OPINION AND ORDER

Portland, OR 97204

Erin F. Highland
Special Assistant United States Attorney
Office of the General Counsel
Social Security Administration
701 Fifth Ave., Ste. 2900 M/S 221A
Seattle, WA 98104-7075

      Attorneys for Defendant

KING, Judge:

Plaintiff Jennifer Lee Hulit brings this action pursuant to section 205(g) of the Social Security Act, as amended, 42 U.S.C. § 405(g), to obtain judicial review of a final decision of the Commissioner[1] denying Hulit's application for disability insurance benefits ("DIB"). I reverse the decision of the Commissioner and remand for a finding of disability.

## BACKGROUND

Hulit filed an application for DIB on July 24, 2012, alleging disability beginning August 29, 2011. The application was denied initially and upon reconsideration. After a timely request for a hearing, Hulit, represented by counsel, appeared and testified before an Administrative Law Judge ("ALJ") on June 5, 2014.

On June 19, 2014, the ALJ issued a decision finding that Hulit was not disabled within the meaning of the Act and therefore not entitled to benefits. This decision became the final decision of the Commissioner when the Appeals Council declined to review the decision of the ALJ on January 29, 2016.

---

[1]Nancy A. Berryhill is now the Acting Commissioner of Social Security. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Nancy A. Berryhill is substituted for Acting Commissioner Carolyn W. Colvin as the defendant in this suit.

**DISABILITY ANALYSIS**

The Social Security Act (the "Act") provides for payment of disability insurance benefits to people who have contributed to the Social Security program and who suffer from a physical or mental disability. 42 U.S.C. § 423(a)(1). In addition, under the Act, supplemental security income benefits may be available to individuals who are age 65 or over, blind, or disabled, but who do not have insured status under the Act. 42 U.S.C. § 1382(a).

The claimant must demonstrate an inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to cause death or to last for a continuous period of at least twelve months. 42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A). An individual will be determined to be disabled only if his physical or mental impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. 42 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3)(B).

The Commissioner has established a five-step sequential evaluation process for determining if a person is eligible for either DIB or SSI due to disability. The evaluation is carried out by the ALJ. The claimant has the burden of proof on the first four steps. *Parra v. Astrue*, 481 F.3d 742, 746 (9th Cir. 2007); 20 C.F.R. §§ 404.1520 and 416.920. First, the ALJ determines whether the claimant is engaged in "substantial gainful activity." 20 C.F.R. §§ 404.1520(b) and 416.920(b). If the claimant is engaged in such activity, disability benefits are denied. Otherwise, the ALJ proceeds to step two and determines whether the claimant has a medically severe impairment or combination of impairments. A severe impairment is one

"which significantly limits [the claimant's] physical or mental ability to do basic work activities[.]"  20 C.F.R. §§ 404.1520(c) and 416.920(c).  If the claimant does not have a severe impairment or combination of impairments, disability benefits are denied.

If the impairment is severe, the ALJ proceeds to the third step to determine whether the impairment is equivalent to one of a number of listed impairments that the Commissioner acknowledges are so severe as to preclude substantial gainful activity.  20 C.F.R. §§ 404.1520(d) and 416.920(d).  If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be disabled.  If the impairment is not one that is presumed to be disabling, the ALJ proceeds to the fourth step to determine whether the impairment prevents the claimant from performing work which the claimant performed in the past.  If the claimant is able to perform work she performed in the past, a finding of "not disabled" is made and disability benefits are denied.  20 C.F.R. §§ 404.1520(f) and 416.920(f).

If the claimant is unable to do work performed in the past, the ALJ proceeds to the fifth and final step to determine if the claimant can perform other work in the national economy in light of his age, education, and work experience.  The burden shifts to the Commissioner to show what gainful work activities are within the claimant's capabilities.  *Parra*, 481 F.3d at 746.  The claimant is entitled to disability benefits only if he is not able to perform other work.  20 C.F.R. §§ 404.1520(g) and 416.920(g).

## STANDARD OF REVIEW

The court must affirm a denial of benefits if the denial is supported by substantial evidence and is based on correct legal standards.  *Molina v. Astrue*, 674 F.3d 1104, 1110 (9th Cir. 2012).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion" and is more than a "mere scintilla" of the evidence but less

than a preponderance. *Id.* (internal quotation omitted).  The court must uphold the ALJ's

findings if they "are supported by inferences reasonably drawn from the record[,]" even if the

evidence is susceptible to multiple rational interpretations. *Id.*

## THE ALJ'S DECISION

The ALJ identified Hulit's severe impairments as:  degenerative disc disease of the

thoracic spine; status post C4-5, C5-6, C5-7 anterior cervical microdiscectomy with

osteophytectomy; foraminotomies, and canal decompression; obesity with BMI 42.4;

patellofemoral pain; lumbar radiculopathy; cervical spondylosis; and postlaminectomy syndrome,

cervical region.  The ALJ also found that these impairments, either singly or in combination, did

not meet or medically equal the requirements of any of the impairments listed in 20 C.F.R. Part

404, Subpart P, Appendix 1.  Given these impairments, the ALJ found Hulit has the residual

functional capacity ("RFC") to perform sedentary work.  Specifically, Hulit can lift and/or carry

10 pounds occasionally and less than 10 pounds frequently; she can stand and/or walk for two

hours in an eight-hour day; she can sit for six hours in an eight-hour day; her ability to balance is

unlimited; she can occasionally climb ladders, ropes, or scaffolds; she can occasionally climb

ramps or stairs; she can occasionally stoop, kneel, crouch, or crawl; and she must avoid

concentrated exposure to heights, hazards, and heavy equipment.  Given this RFC, the ALJ

concluded Hulit could perform her past relevant work as a telemarketer and receptionist.

## FACTS

Hulit was 32 years old on her alleged onset date of disability.  She first injured her back

in 2003, eight years earlier.  She had an L5-S1 microdiscectomy that failed.  In fact, she applied

for disability in 2005 but was not eligible.  She worked from 2005 through 2011 as a mail sorter, receptionist, and performing other clerical work.

Joseph Knaus, Nurse Practitioner with Portland Pain & Spine, examined Hulit in October 2010, when Hulit was still working.  She reported needing to lie down and rotate, using ice and heat, as well as taking Percocet and baclofen.  Knaus suggested she return to Dr. Gore at Micro Neurosurgical Consultants.  Hulit informed Knaus that she was working full time and needed to remain employed.  Her pain averaged 3 out of 10.  Knaus gave her a prescription for a TENS unit and recommended an epidural steroid injection at the L5-S1 level.  The injections did not relieve her pain, but, she reported in April 2011, a regular medication regimen helped her control her pain.  She had carpal tunnel surgery that month and recovered well from it.  At a June appointment with Knaus, Hulit told him that she had recovered from the carpal tunnel surgery, but that her back grew to be more painful after five hours of work.  She was taking MS Contin every eight hours and oxycodone as needed.

Five days before her alleged onset date of disability, Hulit reported for a followup with Knaus.  She said her lower back had been bothering her, as had her mid-back between her shoulder blades.  They discussed additional imaging, and her need to be more pain free in order to exercise and lose some weight.

Hulit applied for short-term disability and, as a result, Trevor Tash, OTR, evaluated her functional capacities in September 2011.  Tash found that Hulit demonstrated some pain behavior (verbal reports of pain, frequent rest breaks, moving stiffly) but that she did not appear exaggerated or dramatic.  He found her capable of performing light work part-time.  He thought Hulit could sit for one hour at a time for a total of five hours, could stand for 30 minutes at a time

for four hours, and could move about or walk for an hour at a time for five hours.  Tash identified several weight limits, as well as positional limitations.  He noted Hulit's gait was smooth and she demonstrated full strength in the upper and lower extremities.  Tash observed Hulit's facial expressions did not match her reports of pain on palpation.

Hulit's short-term disability claim was denied.  Knaus supported Hulit's appeal as he did not feel that it had been appropriate for Tash to include his observations in his report.  In November 2011, Hulit informed Knaus that her pain had improved since she stopped working.  An MRI showed degenerative changes from T6-7 through T11-12, with moderate right foraminal stenosis at T7-8.  At T9-10, there was a paracentral disk protrusion abutting the cord.  She was trying to stay active, but felt better as she could rest as needed.

Fred Williams, M.D., examined her in February 2012.  She was able to walk normally and symmetrically.  She could walk on her heels and toes, but had some difficulty walking on the right toes.  She could step on a platform with either extremity, and she had no difficulty rising from sitting.  An MRI showed a central to leftward herniated disc and edema of the spinal cord causing spinal cord compression at C4-5, a central herniated disc and edema causing severe central canal stenosis at C5-6, and a central leftward herniated disc causing severe left foraminal stenosis impinging on the C7 nerve root.  Given her MRI results, Dr. Williams recommended a C4-7 Anterior Cervical Discectomy and Fusion to decompress the spinal cord and address her motor deficits.

When Knaus learned about the MRI results, he "explained to her it is no wonder she could not do her job or sit still at work and although this was completely unrelated to her low back this probably too was adding to a great deal of her pain." Tr. 387.  Knaus was hopeful her

short-term disability claim would be approved given the "credible objective data to back her claims of being in pain." *Id.* Further, "knowing Dr. Williams the way I do, if he has scheduled her for surgery I know that it is not only necessary but imperative." *Id.*

After surgery, Hulit complained of new radiating right upper extremity pain. Her left upper extremity pain and weakness had resolved. She was walking normally. She displayed tenderness and weakness with isolation of the rotator cuff of the right shoulder.

Hulit returned to Knaus repeating her complaints of bilateral arm weakness, right greater than the left. Her short-term disability claim had been denied. She was continued on MS Contin and oxycodone. She reported pain from between 1 and 7, with an average of 3. She went to the emergency room in July 2012 with ongoing neck and back pain and a pulsating sensation in her head. On examination, Hulit displayed no tenderness in her neck, although she complained of diffuse pain. She displayed some mild tenderness across her paraspinous muscles bilaterally. She was able to walk without difficulty or foot drop. The doctor thought her pain was an acute exacerbation of her chronic neck and back pain. He discussed non-narcotic treatment options with her.

An MRI in December 2012 revealed mild and moderate multilevel foraminal stenosis in Hulit's cervical spine, most pronounced at C6-7, and new right paracentral disc protrusion, causing mild central canal stenosis, at L4-5, as well as recurrent or residual right posterolateral disc protrusion at L5-S1, and moderate right foraminal stenosis, with traversing foraminal neural compromise, at L5-S1 and L4-5.

In January 2013, Hulit sought care from Amy Gerhard, M.D., for chronic pain that she said prohibited her from working. Hulit reported constant headaches and dull, constant pain in

her neck 24/7 since her surgery. She felt spasms down her legs that took her breath away. Oxycodone helped in the past. On examination, she revealed grossly normal range of motion in her joints, no joint tenderness or muscle weakness. Dr. Gerhard recommended adding amitriptylene (an antidepressant) and starting counseling.

Hulit returned to Dr. Gerhard in June 2013, noting a flare that was worse than usual. She had tried the TENS unit, ice, heat, rest, stretching and Aleve. Upon testing, she had normal range of motion in her joints, no joint tenderness or muscle weakness, but a positive straight leg raise on the left. Dr. Gerhard treated her with a few days of opiates, muscle relaxants, and a low dose of Prednisone. They discussed the doctor's view that opiates were not appropriate for long-term treatment of back pain.

In early July, Hulit sought care for abdominal pain that she said she had been having for the past three months. Her provider discussed the possibility of acid reflux, gastritis, or gallbladder disease. Hulit restarted omeprazole, added famotidine, and was directed to make changes in her lifestyle. Two weeks later, she returned complaining of a rash that was diagnosed as heat rash. She reported having a headache and neck ache the previous night, which she had been having "off and on" since her fusion surgery. Tr. 579. At her September appointment with Dr. Gerhard, Hulit reported having a lot of pain, in her back and neck, and in her abdomen, and taking Aleve daily. She reported pain down the right thigh and buttock, and that she felt pain down her neck and into her shoulder. Dr. Gerhard increased Hulit's Effexor and amitriptylene. She would consider re-imaging and looking into neurosurgery if Hulit did not improve.

Hulit returned to Dr. Gerhard's office in January 2014. Hulit complained of right arm pain, saying she was uncomfortable all of the time and she could not sit still. She also reported

PAGE 9 - OPINION AND ORDER

knee pain and constant pain in her head and neck.  She reported using a foam roller, an exercise ball, an elliptical machine and a stationary bike.  She said she could not use these for the past month due to her pain.  She appeared mildly distressed.  After examining her knee, physician's assistant David Counts suspected patellofemoral pain syndrome and recommended physical therapy, naproxen, ice, and rest.  As for her chronic pain syndrome, he recommended increasing the Effexor and referred her to pain management as well as counseling.

Hulit went to the emergency room two days later for right lower back pain, with associated inner leg pain at the knee and some numbness.  She put her pain at 10/10 with any movement, and 7 out of 10 while still.  She said her primary care physician would not "deal with any of my pain."  Tr. 554.  She appeared distressed and uncomfortable, although she displayed a normal mood and affect.  She demonstrated decreased sensation just below her left knee, and positive straight leg raising bilaterally.  Tr. 555.

In March 2014, Hulit sought care for knee pain, and she was told to use ice, heat, naproxen, and a knee brace.  Seven days later, she returned to Dr. Gerhard complaining of knee pain, and reporting that ice, heat and stretching had not helped.  On examination, Hulit displayed grossly normal range of motion in her joints, no joint tenderness or muscle weakness, right knee normal except for reproducible pain with full flexion of the joint.  Dr. Gerhard recommended strengthening the quadriceps and inner thigh muscles.

Hulit attended an appointment at Willamette Pain and Spine Center with Gregory Gullo, M.D.  Dr. Gullo observed her sitting comfortably, in no distress.  Her gait and stride were normal.  She was tender over the sacrum and distal lumbar regions.  Her straight leg raising was positive on the right at 30 degrees, but negative on the left.  Dr. Gullo prescribed MS Contin.  At

PAGE 10 - OPINION AND ORDER

a followup in May, Hulit reported sleepiness with the MS Contin and inquired about Vicodin. She reported continued pain at 8 out of 10. Her gait and stride were normal and her right knee was stable. She was prescribed Norco, and urged to try physical therapy.

Hulit began physical therapy in June. The physical therapist educated Hulit "in avoidance of sitting" and exercises to decrease left extremity symptoms. Tr. 602.

## DISCUSSION

Hulit challenges the ALJ's decision on several grounds. She argues the ALJ incorrectly concluded she did not meet Listing 1.04A, improperly evaluated her credibility, failed to give germane reasons for rejecting the observations of her lay witnesses, and failed to properly evaluate the medical evidence.

## I.   Listing 1.04A

The listings set out at 20 CFR pt. 404, Subpart. P, App. 1 are "descriptions of various physical and mental illnesses and abnormalities, most of which are categorized by the body system they affect." *Sullivan v. Zebley*, 493 U.S. 521, 529-30 (1990). For a claimant to show that his impairment matches one of those listed, the impairment must meet all of the specified medical criteria. *Id.* at 530. Alternatively, a claimant may show that his unlisted impairment is "equivalent" to a listed impairment, but to do so she must present medical findings equal in severity to all the criteria for the one most similar listed impairment. *Id.* at 531. Equivalence is determined on the basis of a comparison between the "symptoms, signs and laboratory findings" about the claimant's impairment, as evidenced by the medical records, "with the medical criteria shown with the listed impairment." 20 C.F.R. § 404.1526. "Medical equivalence must be based on medical findings." *Id.* "A generalized assertion of functional problems is not enough to

establish disability at step three." *Tackett v. Apfel*, 180 F.3d 1094, 1100 (9th Cir. 1999). If a

claimant's impairment matches or is equivalent to a listed impairment, she is presumed unable to

work and is awarded benefits without a determination whether she can actually perform prior

work or other work. *Sullivan*, 493 U.S. at 532.

Hulit bears the burden of proving that she has an impairment that meets or equals the

criteria of an impairment listed in Appendix 1 of the Commissioner's regulations. *Burch v.

Barnhart*, 400 F.3d 676, 683 (9th Cir. 2005). The ALJ concluded Hulit did not meet the criteria

for Listing 1.04A as follows:

> The evidence does not show a spine disorder resulting in compromise of a nerve
> root or the spinal cord with evidence of nerve root compression characterized by
> neuro-anatomic distribution of pain, limitation of motion of the spine, or motor
> loss (atrophy with associated muscle weakness or muscle weakness) accompanied
> by sensory or reflex loss and positive straight-leg raising test. Nor does the
> evidence show lumbar spinal stenosis resulting in pseudoclaudication manifested
> by chronic nonradicular pain and weakness and resulting in an inability to
> ambulate effectively.

Tr. 26.

To meet Listing 1.04A, Hulit must establish four elements: (1) neuro-anatomic

distribution of pain; (2) limitation of motion of the spine; (3) motor loss (atrophy with associated

muscle weakness or muscle weakness) accompanied by sensory or reflex loss; and (4) if

"involvement of the lower back," positive straight-leg raising (sitting and supine). 20 C.F.R. Pt.

404, Subpt. P, App. 1, 1.04A.

The Commissioner contends that while Hulit had one positive straight leg raise bilaterally

(Tr. 555), she also had negative straight leg raises or positive on only one side. Tr. 312, 578,

590, 593, 599. Hulit was never tested from a sitting position. The Commissioner also contends

Hulit had largely normal motor examination results, without atrophy, with normal sensation and reflexes. Tr. 278, 298, 309, 312, 335, 479, 528, 590, 593. Hulit argues only that the supine straight leg raise test is more difficult to meet than the sitting straight leg test and should be sufficient.

"Listed impairments are purposefully set at a high level of severity because the listings were designed to operate as a presumption of disability that makes further inquiry unnecessary." *Kennedy v. Colvin*, 738 F.3d 1172, 1176 (9th Cir. 2013) (quotation omitted). "Listed impairments set such strict standards because they automatically end the five-step inquiry, before residual functional capacity is even considered." *Id.* The record does not support a finding of sensory or reflex loss and positive straight-leg raising (sitting and supine) as required to meet Listing 1.04A. As a result, the ALJ did not err in his listing determination.

II.     Hulit's Credibility

Hulit testified that she lived with her mother and grandmother in a mobile home, and that her mother was disabled with kidney failure. Her mother received dialysis three times a week for four hours. Hulit dropped out of high school and never earned her GED. She had medical insurance until May 2012, and then not again until January 2014. She obtained unemployment benefits for a time, asserting that she could perform part-time work when she filed the claim. She testified that she took Vicodin, amitriptyline, and Effexor. Hulit thought she could walk two blocks, lift a gallon of milk, and sit for an hour. The only thing that helped her pain was lying down. She had one or two friends. She could drive around town to pick up a prescription. She could do her own laundry, but she did not perform other chores. She spent her days watching television, checking the mail, lying down, and showering. She spent time on her phone. She

would go to the library with her grandmother monthly.  She saw her boyfriend every day; either he would come to Hulit's house, or she would drive to his.  They ate out or rented movies.  She reported pain down the side of her leg and into her foot, an electrical shock feeling over her lumbar spine when she walked or pushed herself too hard, and a burning ache in her thoracic spine.  She split tasks up in her day so that she could lie down in between.  When she was working, her attendance was poor.

The ALJ found Hulit's testimony about the effect of her symptoms on her functionality not credible for the following reasons:  she was able to work while experiencing similar symptoms, she received unemployment benefits, her daily activities were inconsistent with her symptom testimony, she made inconsistent statements, and her testimony was inconsistent with the objective medical record.

When deciding whether to accept the subjective symptom testimony of a claimant, the ALJ must perform a two-stage analysis.  In the first stage, the claimant must produce objective medical evidence of one or more impairments which could reasonably be expected to produce some degree of symptom.  *Lingenfelter v. Astrue*, 504 F.3d 1028, 1036 (9th Cir. 2007).  The claimant is not required to show that the impairment could reasonably be expected to cause the severity of the symptom, but only to show that it could reasonably have caused some degree of the symptom.  In the second stage of the analysis, the ALJ must assess the credibility of the claimant's testimony regarding the severity of the symptoms.  *Id.*  The ALJ "must specifically identify the testimony she or he finds not to be credible and must explain what evidence undermines the testimony."  *Holohan v. Massanari*, 246 F.3d 1195, 1208 (9th Cir. 2001).  General findings are insufficient to support an adverse credibility determination and the ALJ

must rely on substantial evidence. *Id.* "[U]nless an ALJ makes a finding of malingering based on affirmative evidence thereof, he or she may only find an applicant not credible by making specific findings as to credibility and stating clear and convincing reasons for each." *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 883 (9th Cir. 2006).[2]

The Commissioner argues Hulit reported back pain for the past 10 to 12 years, but was able to work at SGA levels until 2011, and that she rated her pain at similar levels before she stopped working. The medical record demonstrates, however, that before she left work Hulit sought pain relief in order to keep working and that Hulit felt her pain diminished when she stopped working. Tr. 401 (Hulit's reports about how she managed her pain and that she "needs to remain employed"); Tr. 414 (Hulit remained employed full time and appreciated what Knaus did to help her keep her job); Tr. 394 (Hulit's pain better since she stopped working). Her willingness to continue working while experiencing pain, when she sought treatment prior to stopping work, is not a clear and convincing reason supported by substantial evidence to find her testimony unpersuasive.

Similarly, in this instance, Hulit's receipt of unemployment benefits is not a clear and convincing reason to reject her testimony. She specifically testified that she was not ready, willing and able to work at full time levels. *See* Tr. 49 ("I was applying for part-time. I did speak with the person when I filed the claim and let her know what the doctors said I was released for."); *Carmickle v. Comm'r Soc. Sec. Admin.*, 533 F.3d 1155, 1162 (9th Cir. 2008)

---

[2]The Commissioner argues the clear and convincing standard need not control the analysis, encouraging application of the more deferential regulatory requirement for specific reasons supported by substantial evidence. Def.'s Br. 6, n.2. The Ninth Circuit has rejected her argument. *See Burrell v. Colvin*, 775 F.3d 1133 (9th Cir. 2014) (reasserting that the ALJ must provide "specific, clear and convincing reasons" to support a credibility analysis).

(receipt of unemployment benefits cannot be a credibility factor if the claimant held himself out

for part-time work as that is not inconsistent with disability allegations).

The Commissioner points out that, in addition to the testimony set out above, Hulit wrote

in her function report that she regularly went to a tanning salon, cared for pets, and prepared

simple meals. Daily activities could be relevant for one of two purposes. A claimant's daily

activities might be so substantial such that they equate to an ability to work. *Orn v. Astrue*, 495

F.3d 625, 639 (9th Cir. 2007). Alternatively, the activities might be inconsistent with testimony

purporting to be limited in some way. *Id.* Here, the Commissioner insists Hulit's activities were

inconsistent with her symptom testimony. However, neither the ALJ nor the Commissioner

explains how that is. Hulit's testimony about her daily activities is consistent with her testimony

about her ability to walk two blocks and sit for an hour, lying down periodically throughout the

day in between her chores.

The ALJ relied on the following additional purported inconsistencies: Hulit testified she

did not perform many chores but that her mother did them, when her mother is disabled and in

dialysis three days a week. Additionally, the ALJ felt Hulit was not forthcoming about her

relationship with Finley, when she initially said she did not see friends very often. Finally, the

ALJ felt Hulit described her activities as limited, but noted she reported visiting a tanning salon.

The ALJ recognized that Hulit may not have intended to mislead, but nevertheless felt that "the

information provided by [Hulit] may not be entirely reliable." Tr. 32.

The ALJ may use "ordinary techniques of credibility evaluation, such as the claimant's

reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony

by the claimant that appears less than candid," but the reasons must be supported by substantial

evidence. *Tommasetti v. Astrue*, 533 F.3d 1035, 1039 (9th Cir. 2008). Here, the ALJ failed to point out actual inconsistencies. The record is clear that Hulit answered the questions posed to her and the ALJ himself conceded Hulit may not have intended to mislead. Instead, the ALJ speculated that Hulit's mother was unable to perform chores (when the three women lived together in a small mobile home), assumed Hulit was being less than candid when she did not mention her boyfriend (when asked about friends), and that she described her activities as limited when she went to the tanning salon (when doing so would be consistent with her testimony about her limitations). "While ALJs obviously must rely on examples to show why they do not believe that a claimant is credible, the data points they choose must *in fact* constitute examples of a broader development to satisfy the applicable 'clear and convincing' standard." *Garrison v. Colvin*, 759 F.3d 995, 1018 (9th Cir. 2014).

Finally, the ALJ cannot reject subjective pain testimony solely because it was not fully corroborated by objective medical evidence. *Rollins v. Massanari*, 261 F.3d 853, 857 (9th Cir. 2001). As a result, the last reason supporting the ALJ's credibility analysis is an insufficient basis to uphold the ALJ's decision on Hulit's credibility.

In sum, the ALJ failed to give clear and convincing reasons, supported by substantial evidence in the record, to find Hulit's testimony unreliable.

III.    Lay Testimony

Hulit's boyfriend (Nathan Finley) completed a function report, as did Hulit's mother (Diane Likens) and grandmother (Lynn Turner).

Turner wrote a letter describing seeing Hulit in tears as a result of back and neck pain, and that Hulit has learned to be stoic and not reveal her pain. Similarly, Likens wrote a letter that

Hulit's pain has worsened over time, that she has had to lift Hulit's legs into bed for her, that she

has taken Hulit to the ER, that Hulit's neck surgery caused headaches, and that Hulit could be up

for an hour doing housework before needing to lie down. Finley described witnessing Hulit's

pain, Hulit having trouble walking across the parking lot, and that their activities together were

short and close to home so Hulit can lie down.

Lay testimony about a claimant's symptoms is competent evidence which the ALJ must

take into account unless he gives reasons for the rejection that are germane to each witness.

*Stout v. Comm'r, Soc. Sec. Admin.*, 454 F.3d 1050, 1053 (9th Cir. 2006). The ALJ rejected all

three statements in the following paragraph:

> These lay opinions are based upon casual observation, rather than objective
> medical examination and testing. Further, they are potentially influenced by
> loyalties of family. They do not outweigh the accumulated medical evidence
> regarding the extent to which the claimant's impairments limit her functional
> abilities. Ultimately, these statements are not persuasive for the same reasons I
> find that the claimant's allegations are less than wholly credible.

Tr. 30

The ALJ may not reject lay witness evidence because it is not based on objective medical

evidence. *Bruce v. Astrue*, 557 F.3d 1113, 1116 (9th Cir. 2009). Additionally, to the extent the

ALJ rejected the lay witness observations because of their familial relationship to Hulit, I find it

is not a germane reason in this circumstance. *Regennitter v. Comm'r of Soc. Sec. Admin.*, 16

F.3d 1294, 1298 (9th Cir. 1999) ("alleged bias as [claimant's] mother . . . cannot be a ground for

rejecting his or her testimony"). Dismissal of "'family witnesses' who were therefore

'understandably advocates, and biased' . . . amounted to a wholesale dismissal of the testimony

of all the witnesses as a group and therefore does not qualify as a reason germane to each

PAGE 18 - OPINION AND ORDER

individual who testified. . . .To the contrary, testimony from lay witnesses who see the claimant every day is of particular value; such lay witnesses will often be family members." *Smolen v. Chater*, 80 F.3d 1273, 1288 (9th Cir. 1996) (internal citation omitted); *Noblit v. Colvin*, No. 3:13-cv-00628-HU, 2014 WL 4059770, at *8 (D. Or. Aug. 15, 2014) ("the fact that testimony from a family member or loved one 'appears to be colored by affection for the social security claimant,' standing alone and without further explanation" is not germane); *but cf. Greger v. Barnhart*, 464 F.3d 968, 972 (9th Cir. 2006) (in addition to a close relationship and desire to help, ALJ discounted testimony because it was inconsistent with claimant's presentation to his doctors).

While it is acceptable to reject lay witness testimony for the same reasons given for the claimant, if the testimony is similar, the ALJ failed to give clear and convincing reasons to reject Hulit's testimony. *Valentine v. Comm'r of Soc. Sec. Admin.*, 574 F.3d 685, 694 (9th Cir. 2009). In sum, the ALJ failed to give germane reasons to reject the opinions of the lay witness observations.

## IV.    Medical Evidence

The ALJ relied on state agency medical consultants and gave partial weight to Trevor Tash, OTR, who performed a functional evaluation of Hulit.

The ALJ failed to adequately explain his treatment of Tash's opinion.  He apparently gave some weight to the evaluation, but failed to explain which part of the opinion received that weight.  The ALJ conceded Hulit's concern about Tash's "inappropriate subjective comments" that "interfered with his objective findings," but he reported those objective findings at length. Tr. 31.  Despite a purported bias against Hulit, Tash found Hulit capable of performing only part-time light work.  Tr. 476.  The ALJ did not discuss this aspect of Tash's opinion.

Additionally, the ALJ did not address the statements nurse practitioner Knaus made once he learned about Hulit's cervical MRI results. Tr. 387 (commenting that "it is no wonder she could not do her job or sit still at work"). The ALJ should have considered Knaus' statements about the severity of Hulit's impairments and how they affected her ability to work. 20 C.F.R. § 404.1513(d) (evidence from other medical sources); *Molina*, 74 F.3d at 1111 (ALJ may discount testimony from other sources by giving reasons germane to the witness for doing so).

The ALJ failed to accurately assess the medical evidence in the record.

V.    Remedy

Because the ALJ made errors, remand is appropriate. The court has the discretion to remand the case for additional evidence and findings or to award benefits. *McCartey v. Massanari*, 298 F.3d 1072, 1076-77 (9th Cir. 2002). The court has discretion to credit evidence and immediately award benefits if the ALJ failed to provide legally sufficient reasons for rejecting the evidence, there are no issues to be resolved before a determination of disability can be made, and it is clear from the record that the ALJ would be required to find the claimant disabled if the evidence is credited. *Garrison*, 759 F.3d at 1020. Alternatively, the court can remand for further proceedings "when the record as a whole creates serious doubt as to whether the claimant is, in fact, disabled within the meaning of the Social Security Act." *Id.* at 1021. A decision about whether remand is appropriate turns on the "likely utility of such proceedings." *Harman v. Apfel*, 211 F.3d 1172, 1179 (9th Cir. 2000).

The ALJ failed to provide legally sufficient reasons for dismissing Hulit's testimony and the reports of her lay witnesses, and failed to adequately evaluate the medical evidence. Fully crediting Hulit's testimony and the reports of her lay witnesses, and accepting the medical

opinions of those who treated and examined her, results in a finding that Hulit is unable to sit,

stand and walk for the length of time contained in the RFC on a regular and continuing basis.

When fully crediting the evidence, an ALJ would be required to find Hulit disabled.  Because I

do not see any reason to find "serious doubt as to whether" Hulit is in fact disabled, a remand for

further proceedings is not called for in this matter.

## CONCLUSION

The decision of the Commissioner is reversed.  The case is remanded for a finding of

disability.


IT IS SO ORDERED.

DATED this ___27th___ day of March, 2017.


_____/s/ Garr M. King_____
Garr M. King
United States District Judge